# IN THE COURT OF APPEALS OF IOWA

No. 23-1144
Filed January 9, 2025

**STATE OF IOWA,**
　　　Plaintiff-Appellee,

**vs.**

**ANTONIO LAVELL LEWIS,**
　　　Defendant-Appellant.
_____

　　　Appeal from the Iowa District Court for Warren County, Martha L. Mertz, Judge.

　　　The defendant challenges the sufficiency of the evidence to support his conviction for first-degree murder. **AFFIRMED.**

　　　Martha J. Lucey, State Appellate Defender, and Melinda J. Nye, Assistant Appellate Defender, for appellant.

　　　Brenna Bird, Attorney General, and Sheryl Soich, Assistant Attorney General, for appellee.

　　　Considered by Ahlers, P.J., Chicchelly, J., and Potterfield, S.J.*

　　　*Senior judge assigned by order pursuant to Iowa Code section 602.9206 (2025).

**POTTERFIELD, Senior Judge.**

Antonio Lewis appeals his conviction for first-degree murder, arguing there is insufficient evidence to support the jury's determination he was the person who killed his girlfriend, Karisa Shendelman.

We review "challenges to the sufficiency of the evidence for the correction of legal error." *State v. Banes*, 910 N.W.2d 634, 637 (Iowa Ct. App. 2018). We affirm when the verdict is supported by substantial evidence. *Id.* "Evidence is substantial when the quantum and quality of evidence is sufficient to 'convince a rational fact finder that the defendant is guilty beyond a reasonable doubt.'" *Id.* (citation omitted). In conducting our review, we do not resolve conflicts in the evidence, decide the credibility of witnesses, or weigh the evidence—those decisions are for the factfinder. *See State v. Musser*, 721 N.W.2d 758, 761 (Iowa 2006). Instead, we consider the evidence in the light most favorable to the verdict, "including all reasonable inferences that may be fairly drawn from the evidence." *Banes*, 910 N.W.2d at 637.

For Lewis to be properly convicted of first-degree murder, the State had to prove that Lewis stabbed Karisa; she died as a result of the stabbing; Lewis acted with malice aforethought; and he acted willfully, deliberately, premeditatedly, and with a specific intent to kill her. Lewis challenges only the first element—arguing there is insufficient evidence he was the person who inflicted twenty-one sharp force injuries on Karisa, including a wound that cut her jugular vein.

Lewis's theory of the crime, as presented to the jury through an audio recording of an interview conducted by an agent with the Iowa Division of Criminal Investigation, was that an unidentified man came into the apartment and killed

Karisa. According to Lewis's statements during that interview, he went to sleep at 6:30 or 7:00 p.m. on September 14 after smoking a joint and drinking alcohol. He awoke when he heard a scream; after exiting the bedroom, he saw a person who was approximately 6 feet tall holding Karisa from behind. Lewis grabbed the assailant by the hood of their clothing, and the person—who Lewis assumed was a man based on his height and apparent strength—swung around and then sliced down, causing one injury near Lewis's wrist. At that point, the assailant fled, leaving the apartment and presumably the building. Lewis repeatedly told the agent he did not follow the assailant; he locked the door behind the fleeing person and then tried to get Karisa to stand. When she did not stay up with his help, Lewis ultimately moved her to the couch. After that, he called his brother in a panic, asking him to come to the apartment. He estimated he talked to his brother less than three minutes "and then [Lewis] got off the phone with him and [he] called the police immediately."

But this version of events does not fit well with other evidence the State introduced at trial. Lewis called 911 at 12:29 a.m. on September 15. According to his statement to the agent, he called within about five minutes of the assailant fleeing and, before waking up to the scream, he was asleep in another room. But data from Lewis's phone showed he called his brother six times between 11:09 p.m. and 11:57 p.m. on September 14.[1] And, while Lewis's version would have emergency medical personnel arriving within just minutes of the stabbing, the

---

[1] According to the report of the phone data, Lewis called his brother six times; his brother answered four of those times, and those four calls lasted for a combined total of more than forty-four minutes.

medical responders testified that Karisa's body temperature was already cold to the touch when they arrived—one responder used an infrared temporal scanner to determine the body's temperature and got a reading of "low," which they testified means below 90 degrees. The deputy state medical examiner who completed the autopsy testified that the general rate of cooling "is 1 to 2 degrees Fahrenheit per hour at room temperature, which is around 72 degrees Fahrenheit." Another medical responder noted rigor mortis in Karisa's arm, which one responder testified is not an immediate process. Data from Karissa's phone showed the last activity was at 11:00 p.m., when her maps application was open. And Karisa's downstairs neighbor testified he heard "a big thump" around 11:00 p.m. that night.

Other evidence also contradicted Lewis's version as he explained it in the recorded interview. When Lewis called 911, he reported that there were two assailants. But during the recorded interview, Lewis described just one person. And, while Lewis repeatedly told the agent that he did not leave the apartment building after waking up to the assailant in the apartment, responding police officers noted blood on the stoop outside of the apartment building as they first entered—before Lewis was removed from the apartment by officers. DNA analysis was later run on the blood from the stoop, and it matched Lewis's DNA profile. Plus, according to Lewis's pod mate in county jail,[2] Lewis told him, "I killed a white

---

[2] The pod mate—who had cooperated with prosecutors in at least one other case—was specifically approached by the prosecution for assistance with this case. For his cooperation, the prosecutors agreed to speak to another county attorney about sentencing in another case of the pod mate and to house the pod mate in the Warren County jail.

5

bitch.  I stabbed a white bitch."  Lewis also told the pod mate that he called 911 himself after he did it because he thought it would help his case.

On appeal, Lewis attempts to minimize all the evidence that suggests Karisa died well before his call to 911 at 12:29 a.m.  And he suggests his confusion about the number of assailants, whether he ever left the apartment after the stabbing, and his belief he was asleep (rather than repeatedly speaking to his brother) in the ninety minutes before he called 911 can be explained by the fact that he was drunk and high—not that they are falsehoods.  In other words, Lewis argues alternative explanations for the evidence that incriminates him.  But the jury had all that information; it was free to accept or reject Lewis's version of the events.  *See Blume v. Ary*, 576 N.W.2d 122, 125 (Iowa Ct. App. 1997).  And, when reviewing for sufficient evidence, we broadly and liberally construe the findings of the factfinder in support of the verdict.  *State v. Price*, 365 N.W.2d 632, 633 (Iowa Ct. App. 1985).

Here, the State presented evidence that officers responding to the 911 call found Lewis alone and covered in blood in the apartment with his dead girlfriend.  Lewis's statements to officers explaining what happened were inconsistent—with each other and with the evidence that was collected.  Later, when he was in custody, Lewis admitted that he "stabbed a white bitch."  Substantial evidence supports the jury's determination that Lewis killed Karisa; we affirm his conviction for first-degree murder.

**AFFIRMED.**